United States District Court
Southern District of Texas

**ENTERED**

May 25, 2026

Nathan Ochsner, Clerk

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| IN RE GLOBAL CLEAN ENERGY HOLDINGS, INC., *et al.* | § § § | |
| Debtors, | § § § | CIVIL ACTION NO. H-25-3616 |
| DAVID COSTAGLIO, | § § § | BANKRUPTCY CASE NO. 25-90113 |
| Appellant, | § § | |
| v. | § § | |
| GLOBAL CLEAN ENERGY HOLDINGS, INC., *et al.*, | § § § | |
| Appellees. | § § § | |

### MEMORANDUM AND OPINION

In April 2025, the Debtors—Global Clean Energy Holdings, Inc. and a variety of affiliated debtors and debtors in possession[1]—filed voluntary petitions for relief under Chapter 11. The Bankruptcy Court later entered an order confirming the second amended joint Chapter 11 reorganization plan. The appellant, David Costaglio, now seeks to overturn the Plan, arguing, among other things, that it was not proposed in good faith and that its third-party release, injunction, and gatekeeper provisions are improper. Based on the briefs, the record, and the applicable law, the court affirms the Bankruptcy Court's order confirming the Plan. This appeal is dismissed, for the reasons stated below.

---

[1] The Debtors are: Global Clean Energy Holdings, Inc.; GCE Holdings Acquisitions, LLC; Rosedale FinanceCo LLC; BKRF HCB, LLC; BKRF HCP, LLC; BKRF OCP, LLC; BKRF OCB, LLC; Bakersfield Renewable Fuels, LLC; Agribody Technologies, Inc.; Sustainable Oils, Inc.; GCE International Development, LLC; GCE Texas, LLC; GCEH Ventures, LLC; GCEH CS Acquisition, LLC; and GCE Operating Company, LLC. (Bankr. Docket Entry No. 348 at 82).

## I.       Background

Global Clean Energy Holdings, Inc. is a vertically integrated provider of renewable fuels. (Bankr. Docket Entry No. 215-2 at 17).[2]  As the Debtors explained in their amended disclosure statement,[3] in May 2020, Global raised $300 million in senior secured term loans from a group of lenders to finance the acquisition of a former oil refinery in Bakersfield.  (*Id.* at 19).  Global attempted to convert the existing crude oil refinery into a "state-of-the-art renewable fuels refinery."  (*Id.*).  Global hired CTCI Americas, Inc., an engineering services company whose publicly traded parent is based in Taiwan, to do the construction work at the Bakersfield facility. (*Id.*).  The project had significant cost delays and overruns, creating a "series of disputes and litigation" between Global and CTCI.  (*Id.*).  An interim settlement agreement did not end the disputes.  (*Id.*).  Global eventually notified CTCI that it was terminating their agreement for cause. (*Id.*).  CTCI disputed that the agreement was properly terminated.  (*Id.*).

The delays, cost overruns, and both actual and threatened litigation "posed an existential risk" to Global.  (*Id.*).  From August 2022 through June 2024, the term loan lenders provided more than $380 million in incremental term loans at the price of significant concessions from Global. (*Id.*).  Global also "confronted an over-saturated market for low emission biofuels and a changing regulatory environment."  (*Id.* at 20).  To figure out a path forward, Global hired Lazard Frères & Co. LLC as its investment banker; Kirkland & Ellis, LLP as its legal counsel; Alvarez & Marsal as financial adviser; and Todd Arden as an independent and disinterested director of the Board of Directors.  (*Id.*).  Arden and an existing independent director, Susan Anhalt, made up a "Special

---

[2] All references to "Bankr. Docket Entry No. ___" are references to docket entries in Bankruptcy Case No. 25-90113.

[3] Costaglio's dispute with the characterization of some of these facts is detailed further below.

Committee" of the Board.  (*Id.*).  Arden and Anhalt's job was to evaluate restructuring alternatives and address any conflicts associated with a potential transaction.  (*Id.*).

Global determined that a "value-maximizing path forward" likely involved a global resolution of its disputes with CTCI and continued support from the term loan lenders or a solution underwritten by the term loan lenders in a contested in-court process.  (*Id.*).  Global's advisors, plus an ad hoc group of the term loan lenders holding approximately 96% of the term loans and the lenders' legal counsel and financial advisors, began discussing a global settlement with CTCI.  (*Id.* at 20–21).  In those discussions, CTCI and the term loan lenders disputed the relative priority of their claims.  (*Id.* at 21).  Global asserts that "[t]here is no doubt that this priority dispute, if not resolved, could have resulted in an all-out, value-destructive war between the Term Loan Lenders and CTCI."  (*Id.*).  Those parties and their advisors negotiated for months on settlement terms and restructuring transactions.  (*Id.*).  Global also engaged with Vitol, the lender under Global's revolving credit facility and a "key contract counterparty," to negotiate the restructuring transactions.  (*Id.*).  The term loan lenders continued to provide Global with tens of millions in additional loans during this time. (*Id.*).  Global also continued to work with Lazard to expand its marketing process for a business opportunity, although no opportunity ever materialized.  (*Id.*).

It "became clear" to Global that an in-court restructuring process was needed.  (*Id.*).  Vitol, the ad hoc term lender group, and CTCI—the "Consenting Stakeholders"—engaged in extensive negotiations with each other and with Global in the weeks leading up to filing the Chapter 11 petition.  (*Id.* at 22).  In March 2025, once these stakeholders identified a potential consensual path forward, negotiations became "round-the-clock."  (*Id*).  On April 25, 2025, the Debtors filed voluntary petitions for relief under Chapter 11, along with their proposed Reorganization Plan.  (Bankr. Docket Entry No. 1, 23).  In addition to a settlement with CTCI and billions in takeback

paper in the form of various loan alterations (the "Exit Facilities")[4], the Plan included a third-party release, an injunction enforcing the third-party release, and a gatekeeper clause.  (Bankr. Docket Entry No. 23; *see also* Docket Entry No. 28 at 28 (explaining the Exit Facilities)).  Consent for the third-party release was to be obtained via opt out.  (Bankr. Docket Entry No. 23 at 16).  The "Released Parties" included the Debtors, the Reorganized Debtors, the Consenting Stakeholders, and all holders of claims and interests, among others.  (*Id.*).

As this process was unfolding, the Special Committee investigated the Plan.  (Bankr. Docket Entry No. 340).  It directed Kirkland to review Global's books, records, transactions, and actions taken before the Petition date.  (*Id.* ¶ 16).  Kirkland collected and reviewed tens of thousands of internal documents from eight Debtor custodians and from Alvarez and Lazard.  (*Id.* ¶¶ 16, 18).  Kirkland also interviewed seven of the Debtors' current and former directors.  (*Id.* ¶ 22).  Key areas for investigation included the transactions with CTCI and the Bakersfield project.  (*Id.* ¶ 27).  Kirkland and Arden examined potential claims for breach of fiduciary duty, corporate waste and mismanagement, breach of contract, and fraudulent transfer.  (*Id.*).  Arden concluded that the Debtors had no viable estate claims and that the value of the global settlement far outweighed any value from pursuing litigation against the "Released Parties."  (*Id.* ¶ 46).  He concluded, among other things, that pursuing litigation against the Released Parties would not result in increased recoveries for any creditors.  (*Id.*).

While Arden was investigating, a Creditors' Committee that the U.S. Trustee had appointed shortly after the Debtors filed for bankruptcy, (Bankr. Docket Entry No. 85 (notice of appointment of Committee of Unsecured Creditors)), also investigated.  The Debtors provided tens of thousands

---

[4] In the final Plan, "Exit Facilities" were defined as "collectively, the Exit RCF Facility, the Exit Term Loan Facilities, and the Exit EPC Claims."  (Bankr. Docket Entry No. 348 at 85).

of documents to the Creditors' Committee.  (Bankr. Docket Entry No. 340 ¶ 50).  Arden explained in his declaration to the Bankruptcy Court that after extensive negotiations among the Debtors, the Creditors' Committee, and others, the parties reached a comprehensive settlement, which Global dubs the "Committee Settlement."  (*Id.* ¶ 52; *see also* Docket Entry No. 28 at 33).  The final Plan terms reflected the Committee Settlement.  (Bankr. Docket Entry No. 340 ¶ 52).  The Committee had not supported the Plan when Global filed its amended disclosure statement in late May 2025, (Bankr. Docket Entry No. 215-1 at 4), but did so by late July 2025, following its investigation.[5] (Bankr. Docket Entry No. 340 ¶ 53).

Costaglio, a Global common shareholder, objected to the Plan shortly after it was filed and continued to file a variety of motions to dismiss or otherwise stall the bankruptcy proceedings.  On April 28, 2025, Costaglio filed his objection to the Debtors' Chapter 11 petition.  (Bankr. Docket Entry No. 105).  Costaglio alleged that the Chapter 11 filing breached Global's fiduciary responsibilities to its shareholders and was a "mockery of the bankruptcy process."  (*Id.* at 1, 2). On July 2, 2025, Costaglio filed an emergency motion to dismiss the bankruptcy case, accusing Global of violating securities laws and regulations.  (Bankr. Docket Entry No. 300 at 2).  Costalgio subsequently filed multiple separate motions asking the Bankruptcy Court appoint a trustee or independent examiner and to create a Special Equity Committee on which Costaglio would serve. (Bankr. Docket Entry No. 309; 319; 326).  Costaglio reported his concerns about fraud to the U.S. Trustee.  (Bankr. Docket Entry No. 326 at 2).  On July 22, 2025, Costaglio filed a motion asking the Bankruptcy Court to withhold approval for the Plan until the Committee on Foreign Investment

---

[5] At the confirmation hearing, counsel for the Official Committee of Unsecured Creditors spoke briefly to "rise in support of the [P]lan and recognize the efforts of various parties that led us to today."  (Bankr. Docket Entry No. 353 at 21).

in the United States (CFIUS) approved it, stating that he had already reported the matter to CFIUS.[6] (Bankr. Docket Entry No. 330).

Arden's declaration, which was filed after the last of Costaglio's motions, responded directly to some of Costaglio's allegations. He refuted Costaglio's assertion that Global's former CFO stepped down because he was unwilling to sign what Costaglio asserts are fraudulent SEC filings. (Bankr. Docket Entry No. 340 ¶ 55). Arden also stated that "[b]ased on a review of tens of thousands of documents and interviews with a number of different employees," he had found no evidence or facts to support Costaglio's allegation that Global was falsifying or omitting material information in its SEC filings prior to the petition date. (*Id.*). The U.S. Trustee apparently declined Costaglio's request for an equity committee. (*See* Bankr. Docket Entry No. 353 at 45).

On July 28, 2025, the Bankruptcy Court confirmed the Plan. (Bankr. Docket Entry No. 348). Costaglio attended the confirmation hearing, but he did not cross-examine the Debtors' five witnesses or present any evidence of his own.[7] (Bankr. Docket Entry No. 353). After listening to the witnesses and objectors, including Costaglio, the Bankruptcy Court overruled Costaglio's objections. The Bankruptcy Court explained that Arden's report was "uncontradicted," that he had done a "very fulsome investigation," and that "his report had a lot of credibility." (*Id.* at 66).

---

[6] Costaglio's specific concern was that because the Plan contemplated granting a controlling equity interest in Global to CTCI, a foreign contractor headquartered in Taiwan, CFIUS had to clear the transaction before it could go through. (Bankr. Docket Entry No. 330 at 1).

[7] The witnesses were John Walsh, managing director at Alvarez; Christian Tempke, a managing director at Lazard; Pablo Hernandez, also a managing director at Lazard; Arden; and Stephanie Kjontvedt, a vice president and senior consultant at Epiq Restructuring, the Debtors' claims and noticing agent. (Bankr. Docket Entry No. 353 at 33–34). Costaglio did speak briefly to argue that the proposed confirmation order constituted "legal trickery" and to ask that confirmation be postposed until the U.S. Trustee had reviewed it. (Bankr. Docket Entry No. 353 at 25). He also spoke to confirm that while he was not included in the third-party release, other parties had to opt out, and to discuss other objections made by both himself and the government. (*Id.* at 49–56). He also repeated his argument about CFIUS review. (*Id.* at 62–63).

The Bankruptcy Court also noted that the testimony of John Walsh, the managing director of Alvarez, had established that the only way Global could address its liquidity issues was to have a confirmed Plan pursuant to the Exit Facilities. (*Id.*).  Finally, the Bankruptcy Court explained that there was no cause to appoint an independent trustee; that the Plan clearly stated that it was subject to regulatory approval, making the objection that Costaglio had filed with CFIUS irrelevant; and that it did not have to reach the issue of appointing an independent examiner. (*Id.*at 67–68).

On August 4, 2025, Costaglio appealed.[8]  (Bankr. Docket Entry No. 381).  Costaglio's opening brief contests 10 different aspects of the Bankruptcy Court's decision and the Plan.[9] (Docket Entry No. 23 at 1–2).  The Debtors' response brief clarifies that there are seven core issues

---

[8] The Bankruptcy Court denied Costaglio's emergency motion for a stay pending appeal.  (Bankr. Docket Entry Nos. 383, 388).

[9] As Costaglio frames the case in his opening brief, the issues are:

- Issue #1 – SEC omissions defeat § 1129(a)(3) good-faith and § 1129(a)(11) feasibility.
- Issue #7 – Rash requires replacement value methodology; Lazard's SOTP EV is legally insufficient for special-purpose refinery.
- Issue #9 – Nonconsensual releases + prior-leave gate-keeper render the plan "proposed by means forbidden by law."
- Issue #10 – Confirmation over the U.S. Trustee's Purdue/Pacific Lumber objection was legal error.
- Issue #12 – The court's "postpetition-only" lens misapplied § 1129(a)(3) and (a)(11)
- Issue #13 – Ownership reallocation and insider liquidity show creditor-driven control inconsistent with § 1129(a)(3).
- Issue #14 – Conflicts and inflated EPC claims required a § 1104 trustee/examiner
- Issue #15 – The purportedly disinterested investigation was not; reliance on it was reversible error.
- Issue #16 – Chapter 11 was weaponized to privatize the enterprise and evade SEC accountability.
- Issue #17 – CFIUS exposure was live; deferring it was not good-faith confirmation.

(Docket Entry No. 23 at 1–2).

on appeal.  (Docket Entry No. 28 at 22–23).  The court agrees that the response brief largely appropriately frames the issues.  Adapted lightly from the Debtors' brief, the issues are:

1. Whether the Bankruptcy Court correctly found that the Plan was feasible under 11 U.S.C. § 1129(a)(11);
2. Whether the Bankruptcy Court correctly found that the Plan was proposed in good faith and not forbidden by law under 11 U.S.C. § 1129(a)(3);
3. Whether Costaglio has standing to challenge the third-party release, injunction, and gatekeeper provisions, and if so, whether those provisions are permissible;
4. Whether the Bankruptcy Court correctly declined to appoint a trustee under 11 U.S.C. § 1104(a)(1)–(2);
5. Whether the Bankruptcy Court correctly found that the Debtors' valuation and valuation methods were the appropriate measure of the Reorganized Debtors' value;
6. Whether Costaglio has standing to challenge the Plan based on CFIUS review grounds and whether, if so, whether the Bankruptcy Court properly found that the Plan addressed the necessity of any CFIUS review.

Each of these issues is examined below.

## II.    The Legal Standard

A federal district court has jurisdiction to hear appeals from a bankruptcy court's final orders under 28 U.S.C. § 158(a).  The district court reviews the bankruptcy court's findings of fact for clear error and conclusions of law de novo.  *See In re Whitley*, 737 F.3d 980, 985 (5th Cir. 2013); *In re Lothian Oil, Inc.*, 650 F.3d 539, 542 (5th Cir. 2011).  Matters within the bankruptcy judge's discretion are review for abuse of discretion.  *See In re Gandy*, 299 F.3d 489, 494 (5th Cir. 2002); *In re Waco Town Square Partners, LP*, 536 B.R. 756, 761 (S.D. Tex. 2015).

## III.    Analysis

Because Costaglio's arguments are either meritless, waived,[10] or both, the court affirms the Bankruptcy Court's order confirming the Plan.

---

[10] "It is well established in the Fifth Circuit that, in a bankruptcy appeal, a district court cannot consider issues that were not initially presented to the bankruptcy court." *Ferrell v. Countryman*, 398 B.R. 857, 863 (E.D. Tex. 2009).  It is also well established that arguments not raised sufficiently and distinctly in an opening brief are waived.  *See Cavallini v. State Farm Mut. Auto Ins. Co.*, 44 F.3d 256, 260 n.9 (5th Cir. 1995).  Although the failure to timely assert a right is technically forfeiture and not waiver, *see Kontrick v.*

### A. Plan Feasibility under 11 U.S.C. § 1129(a)(11)

Costaglio argues that the Bankruptcy Court erred when it found that the Plan was feasible under 11 U.S.C. § 1129(a)(11). (Docket Entry No. 23 at 3). "To obtain confirmation of its reorganization plan, a debtor must show by a preponderance of the evidence that its plan is feasible, which means that it is 'not likely to be followed by . . . liquidation, or the need for further financial reorganization." *In re Save Our Springs (S.O.S.) Alliance, Inc.*, 632 F.3d 168, 172 (5th Cir. 2011) (quoting 11 U.S.C. § 1129(a)(11)). "The standard of proof required by the debtor to prove a Chapter 11 plan's feasibility is by a preponderance of the evidence." *In re T-H New Orleans Ltd. P'Ship*, 116 F.3d 790, 801 (5th Cir. 1997). A district court "typically review[s] a bankruptcy court's conclusions about plan feasibility for clear error." *In re Save Our Springs (S.O.S.) Alliance, Inc.*, 632 F.3d at 172.

The Bankruptcy Court did not err, much less clearly err, in determining that the Plan was feasible. The Bankruptcy Court relied on the financial projections attached to the disclosure statement, along with other evidence. (Bankr. Docket Entry No. 348 at 33–34). The Court found that the evidence was reasonable, persuasive, credible, and accurate; used reasonable methodologies; was not controverted by other evidence; and established that confirmation was not likely to be followed by liquidation. (*Id*). The evidence before the Bankruptcy Court included the testimony of Walsh, who explained the preparation and basis for the financial projections and provided his opinion that the Plan was feasible. (Bankr. Docket Entry No. 342 at 24–25, 52–60; *see also* Bankr. Docket Entry No. 353 at 66). It is well-established that "[w]here the projections are credible, based on the balancing of all testimony, evidence, and documentation, even if the

*Ryan*, 540 U.S. 443, 458 n.13 (2004), courts often use "forfeiture" and "waiver" interchangeably. For simplicity, this opinion only uses the term "waiver."

9

projections are aggressive, the court may find the plan feasible." *In re T-H New Orleans Ltd. P'Ship*, 116 F.3d at 820 (alteration in original) (quoting *In re Lakeside Global II, Ltd.*, 116 B.R. 499, 508 n.20 (Bankr. S.D. Tex. 1989)). "Debtors are not required to view business and economic prospects in the worst possible light." *Id.*

Costaglio argues that the projections were nothing more than a "hope," and that the Bankruptcy Court should not have accepted them at face value, (Docket Entry No. 23 at 5), but he offers no evidence in showing that the Bankruptcy Court clearly erred in determining that the Plan was feasible. Costaglio also argues that past SEC omissions undercut the forward-looking projections, (Docket Entry No. 23 at 5), but he similarly does not present support for how the projections are undercut.[11] And as Global explains, even *if* past revenue statements were concealed (and Global argues they were not), past omissions are irrelevant to the Bankruptcy Court's forward-looking feasibility decision in this case. (Docket Entry No. 28 at 40). As Global also points out, the purportedly omitted financial information was provided to the Bankruptcy Court from the outset. (Docket Entry No. 28 at 40 (citing Bankr. Docket Entry No. 2 at 22)).

The court agrees with the Debtors: Costaglio has not shown how the existence of the purportedly false—or at least incomplete—SEC filings means that the forward-looking projections were not credible. And he has not shown that the Bankruptcy Court clearly erred by relying on the detailed financial projections it was provided and the uncontradicted arguments and evidence

---

[11] To the extent that Costaglio's feasibility argument also relies on an assertion that Global made "half-truths," (*see* Docket Entry No. 23 at 5 (citing *Macquarie Infrastructure Corp.*, 601 U.S. 257 (2024)), that argument is irrelevant to the issue of feasibility. And as explained elsewhere, Costaglio does not have standing to challenge the third-party releases, injunction, and most of the gatekeeper provision, and his challenge to the remaining sliver of the gatekeeper provision loses on the merits. His challenges to those provisions cannot undercut the feasibility finding. *See In re Food City*, 110 B.R. 808, 812 n.10 (Bankr. W.D. Tex. 1990).

supporting them.  Clear error is a high bar to meet.[12]  Costaglio has not "met his burden to show that any of the Bankruptcy Court's findings of fact failed to meet this highly deferential standard." *Corletta v. Tex. Higher Educ. Coordinating Bd.*, 531 B.R. 647, 653 (W.D. Tex. 2015).

### B.  Good Faith under 11 U.S.C. § 1129(a)(3).

Intertwined with Costaglio's argument about feasibility under § 1129(a)(11) is his argument about good faith under § 1129(a)(3).  This Code section "requires a plan proponent to 'propose [its plan] in good faith and not by any means forbidden by law.'"[13]  *In re Village at Camp Bowie I, L.P.*, 710 F.3d 239, 244 (5th Cir. 2013) (alteration in original) (quoting 11 U.S.C. § 1129(a)(3)).  "The requirement of good faith must be viewed in light of the totality of the circumstances surrounding establishment of a Chapter 11 plan, keeping in mind the purpose of the Bankruptcy Code is to give debtors a reasonable opportunity to make a fresh start."  *In re T-H New Orleans Ltd. P'Ship*, 116 F.3d at 802.  "Where the plan is proposed with the legitimate and honest purpose to reorganize and has a reasonable hope of success, the good faith requirement of § 1129(a)(3) is satisfied."  *Id.* (quoting *In re Sun Country Dev., Inc.*, 764 F.2d 406, 408 (5th Cir. 1985)).  "The standard of proof required by the debtor to prove a Chapter 11 plan was proposed in good faith is by a preponderance of the evidence."  *Id.*  As with feasibility, the standard of review is clear error.  *See In re Village at Camp Bowie I, L.P.*, 710 F.3d at 247.

---

[12] Costaglio argues that it was "legal error" for the Bankruptcy Court to use a "'post-petition only' filter," (Docket Entry No. 23 at 16), but provides no evidence that the Bankruptcy Court did so when analyzing feasibility.  Regardless, the Bankruptcy Court heard, and considered, Costaglio's arguments about purported misconduct, and noted that Arden's investigation (which found no claims worth pursuing) was credible.  Even *if* the Bankruptcy Court had committed legal error—and the court does not see that it did so—this court can affirm for any reason supported by the record.  As explained elsewhere, there is no evidence of any pre-petition misconduct that would justify reversing the Bankruptcy Court, under any standard of review.

[13] As explained further below, Costaglio does not have standing to challenge the third-party releases and cannot end-run around his lack of standing by framing his challenge as an § 1129 issue.  His challenges based on those provisions are discussed in the separate section below.

The Bankruptcy Court did not clearly err in determining that the Plan was proposed in good faith.  In concluding that the requirements of § 1129(a)(3) were met, Bankruptcy Court explained that it had "examined the totality of the circumstances surrounding the Filing of these Chapter 11 Cases, including the RSA, the Plan, the Confirmation Declarations, the process leading to the Confirmation, including the overwhelming support of Holders of Claims for the Plan, and the transactions to be implemented pursuant thereto."  (Bankr. Docket Entry No. 348 at 30).  The Plan was supported by 100% of holders of prepetition term loan claims, 100% of holders of prepetition CTCI-related claims, and an "overwhelming majority" of the voting holders of unsecured creditors.  (Docket Entry No. 28 at 43; *see* Bankr. Docket Entry No. 334 at 7).  Courts recognize that "arms-length negotiations" and "the overwhelming support of Claimants for the Plan" can provide "independent evidence" of a debtor's "good faith in proposing the Plan."  *In re Gulf Coast Holdings, Inc.*, No. 06-31695-BJH-11, 2007 WL 1340802, at *4 (Bankr. N.D. Tex. Apr. 30, 2007).  And "[a] debtor pursuing a prepackaged plan and proposing a settlement to voters is not bad faith."  *In re Red River Talc LLC*, 670 B.R. 251, 306 (Bankr. S.D. Tex. Mar. 31, 2025).

Against the evidence of months of arms' length negotiations and overwhelming Plan support, Costaglio argued before the Bankruptcy Court (and argues on appeal) that Global made misstatements in its SEC reports and otherwise engaged in securities fraud, which undermines a finding of good faith.  Costaglio's arguments about pre-petition conduct are largely irrelevant to the Bankruptcy Court's good-faith determination, however; pre-petition actions "are immaterial to whether the proposed plan is consistent with the objectives of the Bankruptcy Code and the likelihood of the Plan's success."  *In re Geijsel*, 480 B.R. 238, 255 (Bankr. N.D. Tex. 2012).  Even if it were relevant, there is no evidence of pre-petition misconduct that could support reversing the Bankruptcy Court's good faith determination on any ground.  Arden's investigation found no

evidence of securities fraud or other intentional omissions or actionable conduct. And as the Bankruptcy Court pointed out, the Creditors' Committee would have had an interest in finding causes of action that would have created additional value for them. (Bankr. Docket Entry No. 353 at 65–66). Costaglio himself recognized before the Bankruptcy Court that his interests were "aligned" with those of the Creditors' Committee, because both sought to "maximize creditor recovery" and to "be made financially whole." (Bankr. Docket Entry No. 309 at 1). Had there been viable claims, the Creditors' Committee seemingly would have pursued them.

To the extent that Costaglio's good faith arguments do address post-petition conduct and the Plan itself, (*See* Docket Entry No. 23 at 18–21, 24–27), that his own "view of the record" convinces him that the Bakersfield project was profitable and that the ownership allocation in the Plan is a "payoff for a deliberate strategy to privatize [Global] at equity's expense," (Docket Entry No. 29 at 15–16), is insufficient for this court to find clear error on good faith. That is speculation without evidentiary support.[14]   Much of Costaglio's appeal appears to stem from his (understandable) frustration that he received nothing as a shareholder, but that is simply how the process often works. "In the vast majority of reorganization cases, the debtor corporation is insolvent and, upon confirmation of a plan of reorganization or liquidation, equity holders will receive nothing." *La. World Exposition v. Fed. Ins. Co.*, 858 F.2d 233, 250–51 (5th Cir. 1988). It is "[o]ne of the painful facts of bankruptcy" that shareholder interests "become subordinated to the interests of creditors." *Commodity Futures Trading Com'n v. Weintraub*, 471 U.S. 343, 355

---

[14] Costaglio's reply brief asserts that the Plan was not proposed in good faith because "[a]ny reasonable person can see that, had Debtors disclosed the refinery's true production volumes and tens of millions of dollars it generated in 2024, the market would have immediately recognized the Company's value and the share price would have surged—eliminating any plausible claims of 'hopeless insolvency' and preventing this insider-orchestrated Chapter 11." (Docket Entry No. 29 at 11). There is no credible support for that assertion that could undercut the Bankruptcy Court's evidence-based good-faith determination.

(1985).  That Costaglio lost his investment, and that he believes something generally nefarious was afoot, is insufficient to overturn the Bankruptcy Court's good faith determination.[15]

In sum, as with feasibility, the Bankruptcy Court did not clearly err in determining that, based on the totality of the circumstances, the Plan was proposed in good faith.  "Ultimately, the § 1129(a)(3) inquiry is fact-specific, fully empowering the bankruptcy courts to deal with chicanery.  We will continue to accord deference to their determinations."  *In re Village at Camp Bowie I, L.P.*, 710 F.3d at 248.  Costaglio has provided no basis to undermine the Bankruptcy Court's determination that this complicated Plan, involving multiple settlements, multiple rounds of negotiation, and multiple investigations, was not proposed in good faith.

### C.  The Third-Party Release and Gatekeeper Provisions

Costaglio also challenges the third-party release, injunction, and gatekeeper clauses. (Docket Entry No. 23 at 9).  The Debtors argue that because Costalgio opted out of the third-party release, he does not have standing to challenge either it or the injunction provision, which merely enforces the third-party release.  (Docket Entry No. 28 at 44).  The Debtors also argue that Costaglio lacks standing to challenge the gatekeeper provision and that his challenge fails on the merits.  (*Id.* at 52).  Costaglio repeats many of the criticisms others have made about third-party releases and gatekeeper provisions.  *See, e.g.*, *In re Container Store*, 676 B.R. 356 (S.D. Tex.

---

[15] As the Bankruptcy Court explained, "while it's unfortunate that equity is not getting any recovery here, the absolute priority rule actually dictates that result because I could not have confirmed a plan in which unsecured creditors were getting paid less than full and provide a recovery to equity without the actual consent of the unsecured creditors.  And obviously that wasn't here."  (Bankr. Docket Entry No. 353 at 70). Under the absolute-priority rule, "if a class of unsecured creditors rejects a plan, the plan must provide that those claimants be paid on the effective date or any junior interest 'will not receive or retain under the plan . . . any property.'"  *In re Highland Cap. Mgmt.*, 48 F.4th 419, 433 (5th Cir. 2022) (emphasis omitted) (quoting 11 U.S.C. § 1129(b)(2)(B)).  The absolute priority rule "enforces a strict hierarchy [of creditor] rights defined by state and federal law" and "has long been a feature of American bankruptcy law."  *In re Pac. Lumber Co.*, 584 F.3d 229, 244 (5th Cir. 2009).

2026).  The court agrees in large part with the Debtors and concludes that Costaglio lacks standing to challenge the third-party release and injunction; lacks standing to challenge the part of the gatekeeper provision on Released Parties; and that his challenge to the part of the gatekeeper provision on Exculpated Parties fails on the merits.

Standing in bankruptcy cases is governed by the "person aggrieved test." *In re Coho Energy Inc.*, 395 F.3d 198, 202 (5th Cir. 2004).  "The 'person aggrieved' test is an even more exacting standard than traditional constitutional standing."  *Id.*  "Because bankruptcy cases typically affect numerous parties, the 'person aggrieved' test demands a higher causal nexus between act and injury; appellant must show that he was 'directly and adversely affected pecuniarily by the order of the bankruptcy court' in order to have standing to appeal."  *Id.* at 202–03 (quoting *In re Fondiller*, 707 F.2d 441, 443 (9th Cir. 1983)).  "This restriction narrows the playing field, ensuring that only those with a direct, financial stake in a given order can appeal it.  Thus in bankruptcy litigation, as in life, 'the more money we come across, the more problems we see.'"  *In re Technicool Sys., Inc.*, 896 F.3d 382, 386 (5th Cir. 2018) (quoting NOTORIOUS B.I.G., *Mo Money Mo Problems*, *on* LIFE AFTER DEATH (Bad Boy/Arista 1997)).

In this case, Costaglio was not a "Releasing Party" or a "Released Party."[16]  He cannot show that he was been "directly and adversely pecuniarily" affected by this part of the Plan.  Courts routinely conclude that plaintiffs do not have standing to challenge a third-party release when they opt out of that release.  *Patterson v. Mahwah Bergen Retail Grp., Inc.*, 636 B.R. 641, 664 (E.D. Va. 2022); *In re Indianapolis Downs, LLC*, 486 B.R. 286, 304 (Bankr. D. Del. 2013); *Mercy Health*

---

[16] Costaglio appears not to have formally chosen to opt out but was instead carved out of the Plan as a non-Releasing Party based on his objections. (Bankr. Docket Entry No. 344 ¶ 124).  The carve-out for Costaglio was discussed at the hearing and Costaglio made no objection to it; he merely raised his concern that the general opt-out provision was unlawful for other claimants. (Bankr. Docket Entry No. 353 at 49–51).

*Network, Inc. v. Mercy Hosp.*, 671 B.R. 499, 507 (N.D. Iowa 2025); *Talarico v. Ultra Petrol. Corp.*, No. 4:20-CV-3244, 2020 WL 8361996, at *3 (S.D. Tex. Dec. 29, 2020). The court agrees with these decisions and concludes that Costaglio does not have standing to challenge the third-party release. And because he does not have standing to challenge the third-party release, he does not have standing to challenge the injunction (which enforces the release) or the part of the gatekeeper provision on "Released Parties." The Plan is clear that the part of the gatekeeper provision on "Released Parties" does not apply to parties who have not consented to the third-party release.[17] And although Costaglio mostly frames his challenge to these provisions as part of his good-faith argument (calling them "means forbidden by law"), he cannot obtain standing to challenge these provisions by relabeling them as challenges under §1129. *See Mercy Health Network, Inc.*, 671 B.R. at 508. That would be an end-run around bankruptcy standing. Because Costaglio does not have standing to challenge these provisions, the court does not reach the merits on those issues. *See Ctr. for Biological Diversity v. U.S. Env't Prot. Agency*, 937 F.3d 533, 545 (5th Cir. 2019) ("Because Petitioners lack standing, we do not reach the merits of their claims.").

That the U.S. Trustee objected to the third-party releases and would have had appellate standing to challenge these provisions had it chosen to pursue an appeal, *see In re Container Store Grp., Inc.*, 676 B.R. at 368–71, does not give Costaglio standing to appeal these provisions on the U.S. Trustee's behalf, as he appears to assume it does. (*See, e.g.*, Docket Entry No. 23 at 14 (stating that the U.S. Trustee's objections "preserved" the errors related to the third-party release,

---

[17] The somewhat narrow nature of this gatekeeper provision appears to have been the product of negotiations between the U.S. Trustee and the Debtors. (Bankr. Docket Entry No. 353 (counsel for the Debtors explaining that "we've tried to work with the Office of the United States Trustee by adding some language or clarifying language to the confirmation order, which really says that the gatekeeping provision only applies to the release[d] parties to the extent that any person or entity bringing the claim or cause of action is a releasing party.")).

injunction, and gatekeeping provisions)).[18]   A party generally cannot appeal "to champion the rights of another."  *See Rohn & Hass Tex., Inc. v. Ortiz Bros. Insulation, Inc.*, 32 F.3d 205, 208 (5th Cir. 1994).  "It is hornbook law that 'a party may only appeal to protect its own interests, and not those of a coparty.'"  *Morrison-Knudsen Co., Inc. v. CHG Int'l, Inc.*, 811 F.2d 1209, 1214 (9th Cir. 1987) (quoting *Libby, McNeill, & Libby v. City Nat'l Bank*, 592 F.2d 504, 511 (9th Cir. 1978)).  The U.S. Trustee would have had appellate standing because it "represents a significant and concrete public interest" in advocating for those that have not formally appeared in the proceedings.  *In re Container Store Grp., Inc.*, 676 B.R. at 371.  Costaglio points to no doctrinal equivalent that would give him, a private party, standing to appeal on behalf of the U.S. Trustee.

The court concludes, however, that Costaglio has standing to challenge the part of the gatekeeper provision related to Exculpated Parties.[19]   It is not "speculative" that if Costaglio wanted to sue an Exculpated Party, he would have to receive permission from the Bankruptcy Court to do so.  Global's citations to the contrary are irrelevant to the issue of gatekeeper clauses and prophylactic checks on future litigation.  (*See* Docket Entry No. 28 at 53–54 (citing *In re Highland Cap. Mgmt., L.P.*, 2023 WL 2263022, at \*2 (5th Cir. Feb. 28, 2023) and *In re Technicool*, 896 F.3d at 386)).  The convoluted *Highland* litigation does not show that a claimant must jump through the numerous standing hoops that Global would impose on Costaglio to challenge the gatekeeper provision as it relates to Exculpated Parties.

---

[18] The U.S. Trustee's objection before the Bankruptcy Court may have preserved the issue for appeal, but that does not provide Costaglio with *standing* to appeal on this issue.  *See, e.g.*, *In re First Brands Grp.*, Civ. Action No. H-26-513, 2026 WL 1110319, at 2–3 (S.D. Tex. Apr. 24, 2026).

[19] The Plan defines "Exculpated Parties" as "(a) the Debtors; (b) the independent directors or managers of any Debtor, for conduct within the scope of their duties; and (c) the Committee and each member of the Committee."  (Bankr. Docket Entry No. 348 at 85).

But Costaglio's challenge nonetheless fails on the merits. He has not shown how the part of the gatekeeper provision related to Exculpated Parties was reversible error.[20] In *In re Highland Capital Management*, the Fifth Circuit affirmed a gatekeeper provision with a definition of Exculpated Parties substantially similar to the one here. 132 F.4th 353, 360 (5th Cir. 2025). Costaglio's arguments on the gatekeeper clause relate almost exclusively to the fact that the gatekeeper clause creates a pre-filing injunction against Released Parties, which he argues is improper because the releases were non-consensual. (*See, e.g.*, Docket Entry No. 23 at 10, 13–14). As noted above, Costaglio does not have standing to challenge the consensual (or not) nature of the third-party release. And Costalgio fails to identify or argue any particular error in applying the gatekeeper provision to Exculpated Parties (rather than Released Parties) or why this provision does not comply with *Highland*'s approval of substantially similar gatekeeper provisions. "Judges are not like pigs, hunting for truffles buried in briefs." *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991); *see also United States v. Delgado*, 672 F3d 320, 329 n.6 (5th Cir. 2012) ("We have no obligation to address—much less ferret out—errors not presented in an appellant's opening brief, and as a general matter, such matters are forfeited.") (en banc). The court need not hunt for, or intuit, an error that Costaglio has not adequately presented to the court, no matter that he is pro se. *See Geiger v. Jowers*, 404 F.3d 371, 373 n.6 (5th Cir. 2005) (per curiam) ("Although *pro se* briefs are to be liberally construed, *pro se* litigants have no general immunity from the rule that issues and arguments not briefed on appeal are abandoned." (citation omitted)).

---

[20] For this reason, he has not shown how the part of the gatekeeper provision on Exculpated Parties plausibly violates the good faith requirement, either.

18

In sum, Costaglio lacks standing to challenge the third-party release, the injunction, and the portion of the gatekeeper clause related to Released Parties. He has standing to challenge the portion of the gatekeeper clause on Exculpated Parties, but his challenge fails on the merits.

### D. Appointing a Trustee under 11 U.S.C. § 1104(a)(1)-(2)

Next, Costaglio argues that the Bankruptcy Court erred in failing to appoint a trustee under § 1104(a).[21] (Docket Entry No. 23 at 21). "When a debtor-in-possession is incapable [o]f performing its statutory duties, a chapter 11 trustee may be appointed." *In re Ford Steel, LLC*, 629 B.R. 871, 889 (Bankr. S.D. Tex. 2021). "However, the appointment of a trustee is the exception, rather than the rule, and is an extraordinary remedy." *Id.* "Although the Code contains no particular standard of proof, the majority view is that the party moving for appointment of a trustee must prove the need for a trustee by clear and convincing evidence." *Id.* "When deciding whether relief under § 1104(a)(2) is warranted, courts consider: (i) the trustworthiness of the debtor; (ii) the debtor-in-possession's past and present performance and prospects for the debtor's rehabilitation; (iii) the confidence—or lack thereof—of the business community and of credits in present management; and (iv) the benefits derived by the appointment of a trustee; balanced against the cost of the appointment." *Id.* at 890.

Costaglio did not show that the "draconian" and "rare" remedy of appointing a trustee was warranted. *See In re Texasoil Enterprises, Inc.*, 296 B.R. 431, 435 (Bankr. N.D. Tex. 2003). As

---

[21] The Debtors argue that Costaglio has waived any argument related to the need to appoint an "examiner" under 11 U.S.C. § 1104(c). (Bankr. Docket Entry No. 28 at 59 n.3). The court agrees. As with many of Costaglio's other arguments, the passing mentions of an "examiner" in the opening brief (*see* Docket Entry 23 at 2, 18, 21, 23, 34, 27), are insufficient. *See Grayson O Co. v. Agadir Int'l LLC*, 856 F.3d 307, 316 (4th Cir. 2017) ("A party waives an argument by failing to present it in its opening brief or by failing to develop its argument—even if its brief takes a passing shot at the issue." (cleaned up)). The only argument articulated with any specificity is that a trustee should have been appointed under 11 U.S.C. § 1104(a). Regardless, for the largely the same reasons articulated as to good faith and appointment of a trustee, the Bankruptcy Court did not err in not appointing an independent examiner.

19

detailed elsewhere, the Bankruptcy Court found Arden's investigation credible,[22] and that investigation found no pre-petition conduct that created claims worth pursuing. Nor did Costaglio provide evidence of post-petition conduct that warranted the appointment of a trustee by "clear and convincing" evidence. "A strong presumption exists that the debtor should maintain control of the estate. In order to overcome this presumption, the movant bears the burden of providing by clear and convincing evidence the necessity for the appointment of a trustee." *In re Evans*, 48 B.R. 46, 47 (Bankr. W.D. Tex. 1985). Costaglio did not present the necessary evidence to the Bankruptcy Court of conduct that would justify the extraordinary remedy of appointing a trustee, (*see, e.g.*, Bankr. Docket Entry Nos. 309, 319, 326), which would have cost the Debtors money that they did not have. (*See also* Bankr. Docket Entry No. 353 at 65 (the Bankruptcy Court explained that the only source of funds for an independent person would be the Debtors)). The record shows no basis to reverse the Bankruptcy Court's decision not to appoint a trustee.

### E. Valuation Methods

At various points throughout his opening brief, Costaglio asserts that the Bankruptcy Court used improper valuation methods. However, Costaglio has waived the argument he now makes on appeal. That is, Costaglio's valuation argument is premised on the Bankruptcy Court's alleged failure to apply the replacement value method set forth in *Assocs. Com. Corp. v. Rash*, 520 U.S. 953 (1997). (Docket Entry No. 23 at 6). After the Debtors raised the issue of waiver in their response brief, Costaglio argued in his reply that this argument was not waived because he "consistently challenged Lazard's methodology and conclusions in the Bankruptcy Court."

---

[22] To the extent that Costalgio now challenges Arden's independence, (Docket Entry No. 23 at 23–24), that argument is waived because he did not raise it below. Regardless, Costaglio has not presented sufficient evidence to undercut the Bankruptcy Court's determination that Arden was credible.

(Docket Entry No. 29 at 22).  However, the record does not show that Costaglio raised arguments related to *Rash* sufficient to put the Bankruptcy Court on notice that he was making a challenge based on replacement-value methodology.[23]  The fact that Costaglio is pro se is not, as he asserts (*id.*), a full defense against waiver.  *See United States v. Gonzalez*, No. 23-50193, 2024 WL 1478874, at *2 (5th Cir. 2024) ("True, we liberally construe the briefs of *pro se* litigants and apply less stringent standards to parties proceeding *pro se* than to parties represented by counsel. Nonetheless, *pro se* litigants—like all other parties—remain subject to rules of waiver and forfeiture." (cleaned up)).  The point of waiver is that it "requires parties to put all of their arguments before the appropriate court at the appropriate time for a full resolution of their claims." *In re Cherry*, 341 B.R. 581, 590 n.10 (Bankr. S.D. Tex. 2006).  Costaglio did not do so.

The issue of *Rash* and replacement-value methodology was not sufficiently raised before the Bankruptcy Court.  It is waived.  In any event, as the Debtors argue, *Rash* concerns a specific scenario for cramming down secured claims, *see In re Stembridge*, 394 F.3d 383, 386 (5th Cir. 2004); it does not inherently apply to all valuation calculations.  *See, e.g.*, *In re Mirant*, 334 B.R. 800, 816 (Bank. N.D. Tex. 2005) (describing and applying other kinds of valuation calculations). And Costaglio did not articulate in his opening with any particularity why, outside of the alleged legal failure in not applying *Rash*, the valuation calculations were erroneous, let alone clearly erroneous.[24]  *See In re T-H New Orleans Ltd. P'ship*, 116 F.3d at 799 ("Valuation is a mixed

---

[23] At most, as far as the court can tell, Costaglio argued that the Bankruptcy Court should have applied a "real estate valuation method." (Bankr. Docket Entry No. 319 at 3).  That passing mention of "real estate valuation"—which neither directly mentions "replacement value" nor *Rash*—is insufficient to preserve the arguments he now makes on appeal.  "Merely mentioning a legal issue in general terms [in the court below] is . . . insufficient; an argument must be 'raised to such a degree that the trial court may rule on it.'" *NCDR, L.L.C.*, 745 F.3d 742, 752 (5th Cir. 2014) (quoting *XL Specialty Ins. Co. v. Kiewit Offshore Servs., Ltd.*, 513 F.3d 146, 153 (5th Cir. 2008)).

[24] Costaglio's valuation arguments are all inherently legal challenges based on *Rash*; the court does not see any sufficiently articulated stand-alone factual challenges.  (*See, e.g.*, Docket Entry No. 23 at 9–10).

question of law and fact, the factual premises being subject to review on a clearly erroneous standard, and the legal conclusions being subject to *de novo* review."). The court will not reverse the Bankruptcy Court's conclusion that the valuation evidence was credible, either.

### F.  CFIUS Review

Finally, Costaglio argues that the Bankruptcy Court erred because the Plan's sale of a controlling stake of Global to CTCI triggered a CFIUS review. (Docket Entry No. 23 at 27). The Bankruptcy Court overruled Costaglio's objection, noting that to the extent CFIUS review might be required, the Plan "clearly contemplates that it cannot go effective unless all necessary and required regulatory approvals are obtained, and to the extent that they're not obtained, the [P]lan can't go effective." (Bankr. Docket Entry No. 353 at 67). Costaglio argues that this court should remand to require the Bankruptcy Court to (among other things) determine "whether CFIUS notification . . . is mandatory" and "whether the governance/consent rights and offtake/credit arrangements must be restructured to avoid foreign control." (Docket Entry No. 23 at 28).

The court agrees with the Debtors that Costaglio lacks standing to raise these issues on appeal. (Docket Entry No. 28 at 67–68). Only parties to a transaction or CFIUS itself can initiate review. *See Ralls Corp. v. Comm. on Foreign Inv. in U.S.*, 758 F.3d 296, 302 (D.C. Cir. 2014). Costaglio argues in his reply brief that he has standing "because the failure to obtain any CFIUS clarity before confirmation directly affects the value and stability of the reorganized enterprise." (Docket Entry No. 29 at 24). He asserts that the "regulatory shock" will hit "any residual equity interests," but does not explain how it will affect him personally, given that he is undisputably out-of-the-money. (Bankr. Docket Entry No. 353 at 70). In short, Costaglio has presented the kind of "speculative" harm that the Fifth Circuit has cautioned is insufficient for bankruptcy appellate standing. *See In re Technicool Sys., Inc.*, 896 F.3d at 386. That Costaglio "feels grieved" by the

22

Bankruptcy Court's decision not to force a CFIUS review (however that would work) "does not make him a 'person aggrieved' for the purpose of bankruptcy standing." *Id.*  Because Costaglio does not have standing to raise this issue, the court does not reach the merits of whether, and how, the Bankruptcy Court could force CFIUS review or the kind of restructuring Costaglio seeks.  But the court does note that, as the Bankruptcy Court stated, the Plan could not go into effect until all regulatory approvals that were required were obtained.  The Plan did not allow the Debtors to avoid any necessary approvals, should such approvals be required.[25]

## IV.     Conclusion

The court affirms the Bankruptcy Court's order confirming the second amended joint chapter 11 plan.  (Bankr. Docket Entry No. 348).  This appeal is dismissed.

SIGNED on May 25, 2026, at Houston, Texas.

Lee H. Rosenthal
Senior United States District Judge

---

[25] The court also agrees with the Debtors that to the extent that Costaglio argues in his opening brief that confirming the Plan without CFIUS review violated the good-faith and feasibility requirements, that argument is waived.  (Docket Entry No. 28 at 68).